AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
05/21/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: DM DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT
May 21, 2020
CENTRAL DISTRICT OF CALIFORNIA
BY: MR DEPUTY

United States of America

v.

WILLIAM SADLEIR,

Defendant

Case No.   2:20-mj-02326

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of April 30, 2020 through May 5, 2020, in the County of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344(2) | Bank Fraud |
| 18 U.S.C. § 1014 | False Statements to a Financial Institution |
| 15 U.S.C. § 645(a) | False Statements to the Small Business Administration |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*Nathan Cherney*
Complainant's signature

Nathan Cherney, FBI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   5/21/20

Judge's signature

City and state:   Los Angeles, California

Hon. Pedro V. Castillo, U.S. Magistrate Judge
Printed name and title

**AFFIDAVIT**

I, Nathan Cherney, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2018. I am currently assigned to a Complex Financial Crime squad of the FBI's Los Angeles Field Office, which is responsible for investigating corporate and securities fraud, including mail fraud, wire fraud, securities fraud, and insider trading.

2. Since becoming an FBI Special Agent in 2018, I have received approximately 19 weeks of formal training at the FBI Training Academy in Quantico, Virginia, in financial analysis, interviewing, surveillance, and other investigative techniques. In June 2019, I also attended a multi-day Securities Industry Essentials formal training sponsored by the FBI Economics Crimes Unit. At this training, I received formal training essential to securities industry markets, regulatory agencies and their functions, and prohibited practices. Before joining the FBI, I performed numerous financial audits while employed as an auditor at a public accounting firm for approximately three years. I participated in many aspects of the audits including, but not limited to, procedures for fraud detection, financial analysis, and reviews of accounting and bank records. I received approximately eight weeks of formal training from the accounting firm including, but not limited to, fraud, accounting

principles, financial analysis, and auditing principles. I hold a Bachelor of Arts degree in Economics from the University of Michigan and a Master of Science in Accounting from Michigan State University. I am currently a Certified Public Accountant in the state of California.

3. In addition to my formal training and personal experience, I have learned from and worked alongside numerous senior FBI agents with years of experience in various criminal investigations including, but not limited to, corporate and securities fraud, mail fraud, wire fraud, securities fraud, and insider trading. Throughout my experiences with these senior agents, I have received guidance, training, and hands-on experience in various investigative techniques including, but not limited to, interviewing, surveillance, financial analysis, and other investigative techniques, including with respect to the identification and tracing of illicit proceeds.

## II. PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of a criminal complaint against, and arrest warrant for, WILLIAM SADLEIR ("SADLEIR") for violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344(2) (Bank Fraud), 18 U.S.C. § 1014 (False Statements to a Financial Institution), 15 U.S.C. § 645(a) (False Statements to the Small Business Administration), and 18 U.S.C. 1957 (transactional money laundering).

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

6.   Until recently, SADLEIR operated a film production company called Aviron Pictures, LLC ("Aviron Pictures") and its related entities, all of which are based in Los Angeles, California.  In or about April 2020, SADLEIR submitted three applications for loans to JPMorgan Chase, N.A. ("JPMC") on behalf of three of the Aviron entities -- Aviron Group, LLC ("Aviron Group"), Aviron Licensing, LLC ("Aviron Licensing"), and Aviron Releasing, LLC dba Regatta ("Aviron Releasing") -- through the Paycheck Protection Program established by the Coronavirus Aid, Relief, and Economic Security Act.  JPMC approved the loans, and SADLEIR received a total of over $1.7 million in funds as a result of these loans.  SADLEIR obtained the loans by making false representations about each entity's payroll expenses, their number of respective employees, the operational status of the companies, and how the loan proceeds would be spent.  In fact, SADLEIR intended to use at least some of the funds for personal and other prohibited expenses, and immediately upon receiving the funds a significant amount was diverted to SADLEIR's personal accounts and used for personal expenses.

## IV. STATEMENT OF PROBABLE CAUSE

7. Based on witness interviews I have conducted, my review of documents obtained from third parties, reports of interviews conducted by other law enforcement officers, conversations with other law enforcement officers, and publicly filed documents, I know the following:

**A.   The Paycheck Protection Program**

8. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

9. In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. One such certification requires the applicant (through its authorized representative) to affirm that "[t]he [PPP loan] funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and

4

utility payments; I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

  10. A business's PPP loan application is received and processed, in the first instance, by a participating financial institution, then transmitted, for further review, to the Small Business Administration ("SBA") to assess the applicant's eligibility. If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies.

  11. PPP loan proceeds must be used by the business on certain permissible expenses -- payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time (usually eight weeks of receiving the proceeds) and uses at least 75% of the PPP loan proceeds on payroll expenses.

**B.   SADLEIR and the Aviron Entities**

12.   Based on my review of law enforcement databases and public source documents, I know that SADLEIR is an experienced executive in the film industry who lives in Beverly Hills.  In 2015, he founded Aviron Pictures, a Los Angeles-based film production company that, according to its website, "specializes in the acquisition, marketing, and wide release distribution of talent and story-driven theatrical films in North America."

13.   From my review of publicly available filings with the California Secretary of State ("CA SOS"), I know that SADLEIR is affiliated with several entities with the name Aviron.  For example, SADLEIR is listed with the CA SOS as the manager of both Aviron Licensing and Aviron Releasing.

14.   According to counsel for Aviron Pictures, SADLEIR was formerly in control of Aviron Pictures but was terminated from all managerial roles at Aviron Pictures in approximately December 2019.  According to J.B., the Vice President of Finance for Aviron Pictures, who also manages payroll, SADLEIR did not retain any involvement in the day-to-day operations of the film production business of Aviron Pictures after December 2019.

15.   Law enforcement officers asked J.B. and counsel for Aviron Pictures whether either was aware of any ongoing operations carried out by Aviron Group, Aviron Licensing, and Aviron Releasing.  Neither was aware of any active operations.

16.   SADLEIR retains signing authority over various bank accounts associated with certain of the Aviron entities.  JPMC records show that SADLEIR maintains a number of bank accounts

6

with JPMC, both personal accounts and business accounts related to the Aviron entities. For example:

      a.   SADLEIR is a signatory to a JPMC business checking account in the name of Aviron Group ending in 3760 (the "Aviron Group JPMC account"). The only other signatory to this account is J.B., who, according to publicly filed documents with the CA SOS, is the Vice President of Finance for Aviron Group.

      b.   SADLEIR is a signatory to a JPMC business checking account in the name of Aviron Licensing ending in 6567 (the "Aviron Licensing JPMC account"). J.B. is the only other signatory to this account.

      c.   SADLEIR is a signatory to a JPMC business checking account in the name of Aviron Releasing ending in 2786 (the "Aviron Releasing JPMC account"). J.B. is the only other signatory to this account.

      d.   SADLEIR has a JPMC personal checking account with his wife, Hanan Kadadu ("Kadadu"), ending in 8832 (the "8832 Personal JPMC account"). SADLEIR and Kadadu are the only signatories to this account.

17. Based on my training and experience and publicly available information regarding JPMC, I know that JPMC is a financial institution, as that term is defined in 18 U.S.C. § 20, that is insured by the Federal Deposit Insurance Corporation and is based in New York, New York.

**C. SADLEIR Submits Three Materially False Applications to JPMC for PPP Loans on Behalf of the Aviron Entities**

18. From loan documents provided by JPMC and the SBA, I know that in or around April 2020, SADLEIR submitted three applications for PPP loans to JPMC, each requesting funds for a different Aviron entity, and each was received by the SBA:

   a. First, SADLEIR applied for a loan in the name of Aviron Licensing, claiming that Aviron Licensing had average monthly payroll expenses of $224,418 and a total of 33 employees. The application listed SADLEIR as the principal and listed SADLEIR's home address in Beverly Hills as the loan mailing address.[1] As proof of Aviron Licensing's payroll expenses, SADLEIR provided an IRS Form W-3, purporting to show wage and taxes for Aviron Pictures for tax year 2019.

   b. Second, SADLEIR applied for a loan in the name of Aviron Releasing, claiming that Aviron Releasing had average monthly payroll expenses of $224,418 and a total of 33 employees (the same numbers used in the Aviron Licensing application). The application listed SADLEIR as the principal and listed SADLEIR's home address in Beverly Hills as the loan mailing address. As proof of Aviron Releasing's payroll expenses, SADLEIR provided an IRS Form W-3, purporting to show wage and taxes for Aviron Pictures for tax year 2019. This was the same IRS Form W-3 that SADLEIR submitted in support of Aviron Licensing's application.

---

[1] I know that this is SADLEIR's home address based on documents provided to me by Granite Escrow showing that SADLEIR and Kadadu purchased this home in 2017 in the name of their trust, Temerity Trust Management, LLC.

8

        c.    Third, SADLEIR applied for a loan in the name of Aviron Group, claiming that Aviron Group had average monthly payroll expenses of $236,250 and a total of 33 employees (the same number of employees SADLEIR used in the Aviron Licensing and Aviron Releasing applications). The application listed SADLEIR as the principal and listed SADLEIR's home address in Beverly Hills as the loan mailing address. As proof of Aviron Group's payroll expenses, SADLEIR submitted what appears to be a list of employees at Aviron Group and Aviron Pictures. The document was not dated.

    19.    I have reviewed additional certifications SADLEIR made on and submitted with each loan application package (and which were required by the SBA). Among other things, SADLEIR certified the following:

        a.    SADLEIR certified that each entity "was in operation on February 15, 2020 and had employees for whom the Applicant paid salaries and payroll taxes or paid independent contractors."

        b.    SADLEIR also again certified that "the funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments."

    20.    Based on witness interviews and a review of the documentation SADLEIR submitted with the three loan applications, there is probable cause to believe these certifications were false.

        a.    SADLEIR submitted the same 2019 Aviron Pictures W-3 as proof of payroll expense to support separate loan

applications in two different entities' names: Aviron Licensing and Aviron Releasing.  For the third application, in Aviron Group's name, SADLEIR submitted a list of employees and their purported salaries.  The list claimed that many of the employees in question were employed by Aviron Pictures, the same entity whose W-3 SADLEIR submitted in support of the other two applications.

       b.   J.B. and counsel for Aviron Pictures informed law enforcement that Aviron Pictures has never applied for PPP loans.

       c.   Former employees of Aviron Pictures and J.B. informed law enforcement that at least 50 percent of Aviron Pictures employees were laid off in or about January 2020 and all remaining employees but just a few have been laid off since due to a forced restructuring.  Former employees of Aviron Pictures and J.B informed law enforcement that, by February 15, 2020, Aviron Pictures had far fewer than 33 employees.

       d.   The laid-off Aviron Pictures employees include G.F., I.L., and C.H. The names of all three employees appear on the employee list SADLEIR submitted in support of his payroll expense claim on the Aviron Group loan application.  However, in or around May 2020, G.F., I.L, and C.H. each separately confirmed to law enforcement that they were not employees of Aviron Group, Aviron Licensing, or Aviron Releasing as of February 15, 2020, and that they have not been asked to return to Aviron Pictures as employees or been told that their

employment may be restored.  I.L. and C.H. are now employed elsewhere.

### D. JPMC Initially Funds the Loans Based on the Information Provided by Sadleir

21.  Based on the information provided by SADLEIR, JPMC approved the loans that SADLEIR applied for in the names of Aviron Group, Aviron Releasing, and Aviron Licensing.

22.  On or about May 1, 2020, JPMC funded the PPP loans, wiring the approved funds to the respective Aviron JPMC accounts, for a total of approximately $1,712,715:

    a.  JPMC wired approximately $561,045 into the Aviron Licensing JPMC account.  The balance in the Aviron Licensing JPMC account the day before this deposit (April 30, 2020) was approximately $330.52, meaning that virtually all funds in the account after the deposit were from the PPP loan.

    b.  JPMC wired approximately $590,625 into the Aviron Group JPMC account.  The balance in the Aviron Group JPMC account the day before this deposit (April 30, 2020) was approximately $27, meaning that virtually all funds in the account after the deposit were from the PPP loan.

    c.  JPMC wired approximately $561,045 into the Aviron Releasing JPMC account.  The balance in the Aviron Group JPMC account the day before this deposit (April 30, 2020) was approximately $17.35, meaning that virtually all funds in the account after the deposit were from the PPP loan.

23.  J.B. told law enforcement that she recalled seeing the May 1, 2020 deposit of PPP loan funds into the Aviron Releasing

JPMC account, which she regularly checks as part of her duties at Aviron Pictures. She reported that, the same day, she called SADLEIR about the deposit. According to J.B., on the call, SADLEIR confirmed that he was aware of the deposit. J.B. also told law enforcement that about one month before the deposit, SADLEIR called her and asked for Aviron Pictures' payroll information. J.B. told law enforcement that she did not provide the payroll information to SADLEIR because she did not have it.

### E. SADLEIR Uses the PPP Loan Funds for Personal Expenses

24. After these funds were deposited into the Aviron Group, Aviron Licensing, and Aviron Releasing JPMC accounts, records and information provided by JPMC show that SADLEIR did not use these funds for the business expenses allowed under the PPP but rather used a substantial portion of the funds to pay his and his wife's personal expenses.

25. On or about May 1, 2020, the day the loan funds were deposited in the three JPMC accounts in each of the applicant-entities' names, all of the loan funds -- more than approximately $1.7 million -- were consolidated into the Aviron Group JPMC account. As discussed above, supra ¶ 22.b, because the balance in this account the day before this transfer was approximately $27, the funds in the Aviron Group JPMC account were almost exclusively composed of the PPP loan funds for the three Aviron entities.

26. On or about the next day, May 2, 2020, $966,000 was transferred from the Aviron Group JPMC account into the 8832 Personal JPMC account. Prior to this transfer, the 8832

Personal JPMC account had approximately $349.05 in funds, meaning that virtually all funds in the account after the deposit were from the PPP loans that had been funneled into the Aviron Group JPMC account.

27. Between approximately May 2, 2020, and May 5, 2020, a significant portion of the funds in the 8832 Personal JPMC account, which was composed almost entirely of the PPP loan funds transferred from the Aviron Group JPMC account, was used to pay for various personal and other expenses via interstate wires, contrary to the representations in the loan applications that the funds would be used for the specified business expenses allowed under the PPP.  The expenditures included the following:

    a. On or about May 4, 2020, approximately $67,295.25 was paid to American Express.  Records from American Express show that, on or about May 2, 2020, there was a payment of approximately $26,180.31 made on an American Express credit card in SADLEIR's name and a payment of approximately $40,114.94 made on an American Express credit card in Kadadu's name.  Both of these credit cards appear to be personal credit cards.  For example, the statements of the credit card in SADLEIR's name include charges at the Apple.com record store, the movie theater Arclight Hollywood, and the wine and liquor store Wally's in Beverly Hills, among other expenses.  Similarly, the statements of the credit card in Kadadu's name include charges at clothing stores and various PayPal charges, among other expenses.

    b. On or about May 4, 2020, a payment of approximately $20,510.10 was sent to Bank of America VISA.  Bank

13

of America records show that this payment was for a Bank of America credit card account in SADLEIR's name. The statements for this credit card in the months leading up to this payment show what appear to be personal expenses, such as purchases at the Disney Store, CVS Pharmacy, and the Los Angeles-based restaurant Spago.

        c. On or about May 4, 2020, SADLEIR sent two wire transfers for a total of approximately $69,117.10 to the law firm of Antoni Albus LLP for "SADLEIR INVOICES" and "SADLEIR RETAINER."

        d. On or about May 5, 2020, approximately $40,000 was paid to U.S. Bank, N.A. U.S. Bank records show that this payment was for a car loan in SADLEIR's name. This payment was reversed on the basis that JPMC had implemented a freeze on the 8832 Personal JPMC account by this date.

        e. SADLEIR incurred other non-payroll expenses between approximately May 1, 2020 and May 5, 2020, including at restaurants such as Eataly.

    28. J.B. informed law enforcement that Sadleir has never provided Aviron Pictures with PPP loan funds for its payroll expenses. As described above, the government has interviewed three former Aviron Pictures employees, G.F., I.L, and C.H., laid off before February 15, 2020, and whom SADLEIR listed as employees in support of the Aviron Group loan application. Each told law enforcement that they have never been asked to return to Aviron Pictures or any other Aviron entity.

**F.   SADLEIR Emails JPMC After JPMC Freezes His Accounts and Acknowledges the Purpose of the PPP Loans**

29.  Based on documents provided by JPMC, I know that JPMC placed a hold on the Aviron Group, Aviron Licensing, and Aviron Releasing JPMC accounts on or about May 5, 2020, and a hold on the 8832 Personal JPMC account on or about May 7, 2020, to prevent SADLEIR from dissipating the funds from these accounts. The current balances of these accounts are as follows:

   a.   The current balance of the Aviron Group JPMC account is approximately $662,038.14.

   b.   The current balance of the Aviron Licensing JPMC account is $0.

   c.   The current balance of the Aviron Releasing JPMC account is approximately $17.

   d.   The current balance of the 8832 Personal JPMC account is approximately $497,988.

30.  On or about May 7, 2020, SADLEIR emailed D.M.E., an employee of JPMC, in reference to a call SADLEIR had with D.M.E. the day before in which D.M.E. informed SADLEIR that "Aviron's corporate bank accounts, as well as my wife and my personal bank accounts, have been put on hold by Chase." SADLEIR then wrote:

> The Aviron PPP loans were reviewed by Chase, submitted to and approved by the SBA, and funded last Friday. **As required to satisfy the SBA loan forgiveness provisions, we were prepared and ready to hire full-time employees this week to engage in film acquisition and production (Aviron Licensing), in film marketing and administration (Aviron Group), and in film distribution (Aviron Releasing), all employment restored before the required June 30, 2020 deadline.** (emphasis added). Chase's actions have impaired our ability to satisfy these requirements and has potentially damaged our business viability.

15

> I would appreciate the benefit of being able to explain how we intended to also finance, through the pledge of personal assets, including our home, Aviron's revived operations so that not only would employment be restored, but long-term viability of the companies be sustained beyond the June 30, 2020 period.
>
> We, along with our attorney—copied here, would appreciate a reply today, along with the contact information of the Chase officer reviewing the PPP loans, so that we can immediately remedy the harm caused Chase's misinformed and inappropriate actions.

\* \* \* \*

31. Based on the above information, there is probable cause to believe that SADLEIR made material false statements to JPMC and the SBA in the PPP loan applications submitted on behalf of three Aviron entities and that he improperly used the PPP funds he acquired through these loans from JPMC for personal expenses rather than for the business expenses for which the loan applications certified they would be used.

//
//
//
//
//
//
//
//
//
//
//
//

## V. CONCLUSION

32. For all the reasons described above, there is probable cause to believe that SADLEIR violated 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344(2) (Bank Fraud), 18 U.S.C. § 1014 (False Statements to a Financial Institution), 15 U.S.C. § 645(a) (False Statements to the Small Business Administration), and 18 U.S.C. § 1957.

/s/
Nathan Cherney, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 21st day of May, 2020.

HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE